**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

|                                      |                                    |
|--------------------------------------|------------------------------------|
| PHYLLIS V. WESTMORELAND,             |                                    |
|     Plaintiff,   |                                    |
|       v. | Civil Action No. 09-CV-2453 AW   |
| PRINCE GEORGE'S COUNTY,              |                                    |
| MARYLAND                             |                                    |
|     Defendant.   |                                    |

---

**MEMORANDUM OPINION**

Plaintiff Phyllis M. Westmoreland brings this action against Defendant Prince George's County, Maryland. Westmoreland alleges claims of sex discrimination, racial discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act. Currently pending before the Court are the following motions: (1) Defendant's Motion for Summary Judgment and (2) Plaintiff's Motion for Sanctions and to Strike the Defendant's Motion for Summary Judgment or, in the Alternative, the Affidavits Pursuant to Rule 37(c) (Motion to Strike). The Court has reviewed the entire record and deems no hearing necessary. For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Strike.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Phyllis Westmoreland is an African-American female. Defendant Prince George's County (County) is a political subdivision of the State of Maryland. Westmoreland

1

started working at the Prince George's County Fire Department (Department) as a firefighter in 1989. Westmoreland eventually earned the rank of Fire Lieutenant.  Despite the contentious events that unfolded in the Department, *see infra*, Westmoreland retired from the Department in 2009 with the same rank.[1]

In August of 2005, Westmoreland was assigned to the Fire/EMS Training Academy (Academy). Westmoreland had the rank of Fire Fighter III when she entered the Academy. Sometime after her promotion to lieutenant, Westmoreland, took a position at the Officer Candidate School (OCS) at the Academy. This position involved some supervisory and classroom instruction functions.

In the spring of 2006, Westmoreland was implicated in a cheating scandal at the Academy. The basic accusation was that Westmoreland spoon-fed recruits answers to a promotional test. In the aftermath of this accusation, Westmoreland filed an internal EEO complaint on June 30, 2006. Shortly thereafter, the County attempted to transfer Westmoreland from the Academy. Westmoreland contends that she was actually transferred out of the Academy for three days, though this fact is in dispute. In any case, it is undisputed that the County retracted its attempt to transfer Westmoreland on July 3, 2006.

In early- to mid-October 2006, the Department transferred Westmoreland from the Academy, reassigning her to Station 40. Station 40 is a fire station. Westmoreland contends that the transfer caused her job duties to change significantly.

In mid- to late-October 2006, Westmoreland filed a formal charge of discrimination with the EEOC. The EEOC issued a right-to-sue letter in late June 2009. Roughly three months later, Westmoreland filed a Complaint in this Court. Doc. No. 1. Count I of the Complaint asserted

---

[1] The Parties do not address the extent to which Westmoreland's retirement would affect the damages for which she might be eligible if she prevailed on one or more of her claims.

claims for sex discrimination, racial discrimination, retaliation, and hostile work environment. The County moved to dismiss (First Motion to Dismiss) and, in an Opinion and Order dated August 23, 2010, the Court granted in part and denied in part the County's First Motion to Dismiss. Doc. Nos. 22–23.

In its August 23, 2010 Opinion, the Court categorized the claims in Counts I (sex discrimination) and II (racial discrimination) as follows: (1) disparate treatment based on discriminatory reassignment; (2) disparate treatment based on discriminatory discipline; and (3) disparate treatment based on a failure to investigate. The Court then took the following actions with respect to these claims: (1) the Court denied the First Motion to Dismiss as to the discriminatory reassignment claim; (2) granted it with prejudice as to the discriminatory discipline claim; and (3) granted it without prejudice as to the failure to investigate claim. In retrospect, as the Court explains below, it was somewhat improvident to categorize Westmoreland's sex and racial discrimination claims as such.

In response, on September 2, 2010, Westmoreland filed an Amended Complaint. Doc. No. 26. The Amended Complaint contains eight counts. They are: (1) gender discrimination based on discriminatory request for transfer; (2) race discrimination based on discriminatory request for transfer; (3) gender discrimination based on discriminatory reassignment to Station 40; (4) race discrimination based on discriminatory reassignment to Station 40; (5) gender discrimination based on failure to investigate; (6) race discrimination based on failure to investigate; (7) retaliation based on transfer out of the Academy; and (8) hostile work environment based on gender.

The County subsequently moved to dismiss (Second Motion to Dismiss) Counts 5, 6, and 8. On August 31, 2011, the Court issued an Opinion and Order in which it denied the County's

Second Motion to Dismiss. Doc. Nos. 50–51. The case went into discovery and the County filed a fifty-page Motion for Summary Judgment on February 15, 2012. Doc. No. 55. In response, Westmoreland lodged her Motion to Strike. Doc. No. 56. Westmoreland alleges therein that "Defendant took the affidavits of at least seven (7) individuals but failed to provide them to the plaintiff in violation of Rule 26(e)." Doc. No. 56-1 at 1. Westmoreland further asserts that "[t]hese alleged undisputed facts lay the entire foundation for the . . . arguments made in support of the Defendant's motion for summary judgment." *Id.* at 3. Based on these allegedly underhanded tactics, Westmoreland invites the Court to take the following steps: (1) strike the County's Motion for Summary Judgment or, alternatively, the seven challenged affidavits; (2) strike certain witnesses from appearing at trial; and (3) award attorney's fees.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.*

4

Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, the nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.    LEGAL ANALYSIS

## A.    Preliminary Matters

The disjointed manner in which Westmoreland presented her claims in the Amended Complaint appears to have arisen from the Court's decision to subdivide Westmoreland's sex and racial discrimination claims in the manner described above. After all, Westmoreland's initial Complaint contained just four counts: (1) sex discrimination; (2) racial discrimination; (3) retaliation; and (4) hostile work environment. In hindsight, it was improvident to break up the claims in this fashion because, irrespective of the factual allegations on which Westmoreland predicated her claims, the ultimate question was whether she suffered sex and/or racial discrimination in violation of Title VII. Therefore, consistent with the manner in which Westmoreland presented her claims the original Complaint, the Court treats the eight counts Westmoreland asserts in her Amended Complaint as just four: (1) sex discrimination; (2) racial discrimination; (3) retaliation; and (4) hostile work environment.

**B.      Motion to Strike**

Rule 26(a) imposes a basic duty on parties to disclose certain information about individuals likely to have discoverable information. *See* Fed. R. Civ. P. 26(a)(1)(A)(i). Parties also must disclose certain information regarding evidence they plan to present at trial, including witnesses. *See* Fed. R. Civ. P. 26(a)(3)(A)(i). In like spirit, Rule 26(e) requires parties to seasonably supplement disclosures made under Rule 26(a). *See* Fed. R. Civ. P. 26(e)(1)(A). The duty of seasonable supplementation, however, does not attach where the "the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Id.*

Rule 37(c) sets forth procedural remedies for the failure to make disclosures. Pertinently, it provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). Rule 37(c) further provides:

> In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> > (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> >
> > (B) may inform the jury of the party's failure; and
> >
> > (C) may impose other appropriate sanctions, . . . .

Fed. R. Civ. P. 37(c).

As stated, Westmoreland invites the Court to take the following steps: (1) strike the County's Motion for Summary Judgment or, alternatively, the seven challenged affidavits; (2) strike certain witnesses from appearing at trial; and (3) award attorney's fees. The Court examines the propriety of each of these steps in turn.

       *1.*      *The Propriety of Striking the County's Motion for Summary Judgment or, Alternatively, the Challenged Affidavits*

The Court declines to strike the County's Motion for Summary Judgment. As the ensuing analysis evinces, the Court did not rely on the contested affidavits in a way that prejudices Westmoreland. Indeed, the Court denies the County's Motion for Summary Judgment as to three of her four claims. Furthermore, in dismissing Westmoreland's sexual harassment claim, the Court does not rely on any of the challenged affidavits. In short, at least for the purposes of the County's Motion for Summary Judgment, its use of the at-issue affidavits is harmless. Likewise, striking the affidavits in question would serve no useful purpose. Accordingly, the Court declines to strike either the County's Motion for Summary Judgment or the contested affidavits.

       *2.*      *The Propriety of Striking the Appearance of Certain Witnesses at Trial*

Westmoreland moves the Court to preclude the following potential witnesses from testifying at trial: Terrace White; Regan Carter; Tyrone Cotton, Jr.; Wayne Crosby; Matthew Kershaw; Craig Smith (C. Smith); Mark Smith; and Stephanie Buffum. Doc. No. 56-1 at 7. It is unclear whether Westmoreland seeks the preclusion of the testimony of the County employees whose allegedly belated affidavits Westmorland contends surprised her. These individuals are: Kenneth Fusco; James McClelland; C. Smith; White; Carter; Cotton; and Raymond Gheen. *See id.* In light of this uncertainty, the Court considers only the propriety of precluding the first list of potential witnesses.

As outlined above, parties that fail to identify a witness as required under Rule 26 may not have that witness testify at trial unless the failure was substantially justified or is harmless. In the Fourth Circuit, courts must apply a five-factor test when deciding whether the failure to identify a witness was substantially justified or harmless. *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596–97 (4th Cir. 2003). They are: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* at 597. "Four of these factors—surprise to the opposing party, ability to cure that surprise, disruption of the trial, and importance of the evidence—relate mainly to the harmlessness exception . . . ." *Id.* "[T]he remaining factor—explanation for the nondisclosure—relates primarily to the substantial justification exception." *Id.* District courts enjoy "broad discretion" when applying these factors. *Id.*

The Court commences the analysis by examining the County's explanation for its failure to identify the witnesses at an earlier time. The County did not disclose the first set of individuals in its initial answers to interrogatories. Doc. No. 58-4 at 5. Rather, it first revealed them in its supplemental answers to interrogatories of December 20, 2011. Doc. No. 58-5 at 4. This date fell eleven days before the discovery deadline of December 31, 2011. *See* Doc. Nos. 47–48. The County supplemented its answers to interrogatories again on December 29, 2011, just two days before the discovery deadline. Doc. No. 58-6 at 4.

 The County has offered an adequate justification for its failure to disclose these witnesses at an earlier date. The County asserts that Westmoreland referred to these individuals during her deposition and that it took time to ascertain their identities and interview them.

8

Westmoreland was deposed in late June and early July 2011, and the County disclosed the witnesses five to six months later. Although this delay seems a little long, the County's failure to identify the witnesses at an earlier time might have stemmed from any number of sources (e.g., the hustle and bustle of a busy public office). Therefore, factor (5) is a wash.

Factors (2) and (3) tip in the County's favor. Regarding factor (2), Westmoreland has a meaningful opportunity to cure the surprise of which she complains because the Court can simply allow her to depose any of the supplemental witnesses the County intends to call. As for factor (3), there is no reason to believe that the testimony (assuming its relevance) of the supplemental witnesses will disrupt the impending trial. Westmoreland presumably has knowledge of the incidents about which they will testify. Furthermore, if she wishes, Westmoreland may depose any of these witnesses the County plans to call. Therefore, this case does not portend the "trial by surprise" whose end liberal discovery envisioned. *See Taylor v. Illinois*, 484 U.S. 400, 411 n.16 (1988) (citations omitted).

Factors (1) and (4), however also favor the County. Regarding factor (4), the confrontations about which these witnesses evidently would testify may be a component of the County's proffered nondiscriminatory reason for firing Westmoreland. Arguably, moreover, the Federal Rules of Evidence presume the importance of relevant evidence. *Cf.* Fed. R. Evid. 402; *Old Chief v. United States*, 519 U.S. 172, 186–89 (1997).

Factor (1) focuses on surprise. The County does not dispute that it disclosed these witnesses eleven days before the discovery deadline. Objectively, such proximity to the discovery deadline would suffice to catch someone off guard. Tellingly, though, Westmoreland neither moved the Court for an extension of the discovery deadline to depose these witnesses nor otherwise objected to their inclusion in the County's supplemental responses. Instead, she stood

by idly for two-and-a-half months, failing to raise the issue until after the County had filed its Motion for Summary Judgment. This observation, coupled with the fact that Westmoreland filed the Motion to Strike before her untimely response to the County's Motion for Summary Judgment, supports the inference that Westmoreland's reason in contesting the listed witnesses may involve strategy more than surprise.

Ultimately, this five-factor balancing test shakes out in favor of the County. Factor (5) is the only factor that may weigh in Westmoreland's favor. Factors (1) and (4), however, strongly favor the County. Factors (2) and (3) also tip in the County's favor, though by a less decided margin. Accordingly, the Court declines to strike the appearance of the belatedly disclosed witnesses. Rather, the Court directs the Parties to discuss whether supplemental depositions are necessary and, if so, to jointly propose an amended scheduling order for the express and sole purpose of conducting said depositions.

3.      *The Propriety of Awarding Attorney's Fees*

The Court declines to award Westmoreland attorney fees. Westmoreland has received some of the relief that she requested in that the Court did not rely on the contested affidavits to rule on the instant Motion for Summary Judgment. Furthermore, to the extent the County's somewhat unseasonable identification of the witnesses portends prejudice, the Parties can cure this prejudice by conducting supplemental depositions.

**C.      Motion for Summary Judgment**

1.      *Preliminary Matters*

Westmoreland asserts the following claims: (1) sex discrimination; (2) racial discrimination; (3) retaliation; and (4) sexual harassment. As it did in its August 31, 2011 Opinion, the Court treats the claims for sex discrimination and racial discrimination in tandem.

*See* Doc. No. 50 at 8–10. The Court takes this action because Westmoreland appears to make out an intersectional claim for sex and racial discrimination.

"Intersectionality theory posits that individuals have multiple identities that are not addressed by legal doctrines based solely on a single identity or status." Dianne Avery et al., Employment Discrimination Law 47 (8th ed. 2010). That is, "some cases present evidence that points to discrimination occurring not only because of the plaintiff's sex, but because of both sex and some other characteristic." Avery et al., *supra*, at 352. Although the Fourth Circuit has yet to answer this question, *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 337 n.4 (2010), "[s]everal courts have been willing to embrace intersectionality theory in Title VII cases." Avery et al., *supra*, at 47. The leading case for this proposition is *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980). The majority of federal courts have followed the *Jefferies* approach, including at least two circuits. *See, e.g.*, *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1561–62 (9th Cir. 1994); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987); *Jeffers v. Thompson*, 264 F. Supp.2d 314, 327 (D. Md. 2003). Indeed, albeit in dicta, the Supreme Court has favorably cited *Jefferies* for the proposition that African-American females may assert intersectional claims under Title VII. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 n.10 (1999). The Court joins this evolving body of authority and concludes that intersectional claims based on sex and race are generally cognizable under Title VII.

In this case, Westmoreland consistently contends that the County has discriminated against her as an African-American female. Thus, it is unsurprising that Westmoreland relies on substantially overlapping facts to establish her sex and racial discrimination claims. Moreover, the *McDonnell-Douglas* evidentiary framework applies to both sex discrimination and racial

discrimination claims. Therefore, the Court deems it proper to treat Westmoreland's sex and racial discrimination claims in tandem and proceeds to address them accordingly.

2.    *Sex and Racial Discrimination—McDonnell-Douglas*

a.    Prima Facie Case

"To demonstrate the prima facie case of sex . . . discrimination under the pretext framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (citing *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (1999)).

In this case, the County concedes that Westmoreland, an African-American female, is a member of a protected class. Therefore, the Court considers only elements (2), (3), and (4).

i.    Adverse Employment Action

Westmoreland argues that three events constituted adverse employment actions: (1) the attempted transfer from the Academy; (2) the County's failure to investigate her complaint that her apparent involvement in a prior cheating incident was improperly leaked to the media; and (3) her eventual transfer to Station 40. The County, to be sure, responds that none of these actions constitutes an adverse employment action within the meaning of Title VII.

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Thorn v. Sebelius*, 766 F. Supp.2d 585, 598 (D. Md. 2011) (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007)). "Although conduct short of ultimate employment decisions can constitute adverse employment

action, there still must be a tangible effect on the terms and conditions of employment." *Id.*
(quoting *Geist v. Gill/Kardash P'ship*, 671 F. Supp.2d 729, 737 n.6 (D. Md. 2009)).

 Here, the Court summarily holds that no reasonable juror could conclude that actions (1)
and (2) are adverse employment actions. As for action (1), although Westmoreland insists that
the attempted transfer was a transfer in fact, she concedes in her deposition that the transfer
lasted for only two days, whereupon the Department promptly reassigned her to the Academy.
*See* Doc. No. 57-3 at 24–26; *see also* Doc. No. 7-4, Ex. 1 ¶ 23.

 Likewise, action (2) fails to amount to an adverse employment action. Westmoreland has
presented no authority proposing that an employer's failure to investigate an alleged leak of
purportedly private information constitutes an adverse employment action, and the Court is
aware of none. In short, a "failure" of this sort does not tangibly affect the conditions of an
employee's employment. *Compare Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–
67 (2006) (explaining that adversity for the purposes of Title VII's sex and race discrimination
proscription is a higher standard than adversity within the meaning of Title VII's retaliation
provision), *with Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010)
("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an
adverse employment action taken in retaliation for the filing of the same discrimination
complaint.").

 The Court must consider, however, whether a reasonable juror could conclude that action
(3) constitutes an adverse employment action. To reiterate, "[a]n adverse employment action is a
discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's
employment.'" *Holland*, 487 F.3d at 219 (alteration in original) (quoting *James v. Booz-Allen &
Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). "'The mere fact that a new job assignment is

less appealing to the employee, however, does not constitute adverse employment action.'" *Id.* (quoting *James*, 487 F.3d at 376). Rather, "[t]here must be some significant detrimental effect and 'absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.'" *Id.* (quoting *Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999)).

In this case, the County argues that Westmoreland's reassignment to Station 40 is not an adverse employment action for three main reasons: (1) Westmoreland received the same salary at Station 40; (2) Westmoreland received larger bonuses at Station 40 than at the Academy; and (3) Westmoreland retained the rank of lieutenant upon her transfer to Station 40. Westmoreland counters that the transfer constituted an adverse employment action because her job duties were more demanding.

The Court agrees with Westmoreland; a genuine dispute of material fact exists regarding whether the transfer had a significant detrimental effect on the conditions of Westmoreland's employment. Westmoreland testified that her position as a firefighter at Station 40 entailed "significantly different responsibilities." Doc. No. 55-5 at 18. These duties, according to Westmoreland, included "responding to fires . . . [and] to medical emergencies." *Id.* at 20. In other words, at Station 40, Westmoreland would have to perform "routine fire fighter type functions." *Id.*

Construed in Westmoreland's favor, this testimony creates a triable issue on whether the alleged changes in Westmoreland's job responsibilities were significantly more stressful or demanding than her job responsibilities at the Academy. Admittedly, the undisputed evidence

14

shows that the transfer failed to result in a decrease in compensation or job title. Doc. No. 55-5 at 19–21. Furthermore, some evidence suggests that Westmoreland earned substantially higher bonuses at Station 40 than at the Academy, *see* Doc. No. 55-30 at ¶¶ 60–65, though Westmoreland disputes this fact. Ultimately, it is the province of the trier of fact to resolve these disputes and determine whether the transfer had a significant detrimental effect on the conditions of Westmoreland's employment.

ii.       Satisfactory Performance of Job Duties

The County argues that Westmoreland cannot demonstrate that she was successfully performing her job duties for two main reasons: (1) Westmoreland allegedly displayed attendance and "competence" problems before the April 2006 cheating scandal erupted; and (2) Westmoreland failed to satisfactorily perform her job duties based on her alleged involvement in the cheating scandal. *See* Doc. No. 55-2 at 23.

To rebut this evidence, Westmoreland points out that the County gave her an overall appraisal rating of "satisfactory" for the period of May 1, 2006 to October 9, 2006. Doc. No. 57-10 at 2; Doc. No. 57-7 at 9. Westmoreland further notes that the Department transferred her to Station 40 on October 10, 2006. Doc. No. 55-5 at 18. From these facts, a reasonable juror could infer that Ms. Westmoreland was performing at a satisfactory level for at least the half-year period immediately preceding her transfer. The County responds that Westmoreland displayed attendance and "competence" problems prior to this period. This response is a red herring. The question is whether the employee is meeting her employer's legitimate expectations at the time of the transfer, not more than six months before the same. Accordingly, a reasonable jury could conclude that Westmoreland was satisfactorily performing her job duties when the Department transferred her to Station 40.

        iii.     Whether the Position Remained Open or Was Filled by Similarly
               Qualified Applicants Outside the Protected Class

The County argues that Westmoreland's "disparate treatment claims fail as a matter of law because she failed to present sufficient facts to show that similarly situated employees outside her protected class were treated differently." Doc. No. 55-2 at 24–26. This argument misses the point. Regarding the fourth element of the prima facie case for disparate treatment claims, the question is whether "the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill*, 354 F.3d at 285 (citing *Brinkley*, 180 F.3d at 607); *see also Holland*, 487 F.3d at 214; *James*, 368 F.3d at 375. In other words, there is no strict requirement that plaintiffs prove the existence of one or more similarly situated comparators to satisfy the fourth element. *See id.*; *see also Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)) ("Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim."). This observation comports with the Supreme Court's edict that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Thus, the Court considers the narrower inquiry whether a reasonable juror could conclude that the Department filled Westmoreland's position with similarly qualified applicants outside her protected class. Westmoreland testifies that, upon her transfer, the Department replaced her with two white males: Lt. Kirchbaum and C. Smith. Doc. No. 57-3 at 42. Although Westmoreland concedes that both Kirchbaum and C. Smith were already at the Academy when she was transferred, she asserts that they worked in other branches and were subsequently assigned to her position in a separate branch. *Id.*

The County counters that Kirchbaum and C. Smith could not have replaced Westmoreland because they were already at the Academy. The County characterizes C. Smith as a civilian employee and insists that he could not have replaced Westmoreland because she was a lieutenant. Further, the County states that Westmoreland conceded in her deposition that Kirchbaum's and C. Smith's duties differed form hers, thereby concluding that they are not similarly situated. Finally, the County maintains that Westmoreland was not replaced because her position was allegedly abolished. *See* Doc. No. 55-2 at 25–26.

Looking at these facts leniently, a reasonable juror could conclude that Westmoreland's position was filled by similarly qualified applicants outside her protected class. Westmoreland testified that Kirchbaum replaced her, and the County concedes that Kirchbaum worked in the Academy. Although the County contends that Westmoreland's position was abolished, Westmoreland's testimony that the Department transferred Kirchbaum into her branch throws this fact into dispute. Furthermore, while the County contends that C. Smith, as a civilian employee, could not have assumed Westmoreland's job duties, the evidence indicates that Kirchbaum was a lieutenant like Westmoreland. Therefore, though some appreciable differences in Kirchbaum's and Westmoreland's qualifications may exist, a reasonable jury could conclude that Kirchbaum is similarly qualified to Westmoreland. Concluding otherwise would define the requirement of similar qualification at an improperly lofty level of specificity. *Cf. Burdine*, 450 U.S. at 253 (indicating that the plaintiff must provide evidence that she was transferred "under circumstances which give rise to an inference of unlawful discrimination" to satisfy element four of the prima facie case for disparate treatment claims); *Haywood*, 387 F. App'x at 359 (citing *Bryant*, 333 F.3d at 545).

Even if a reasonable jury could not conclude that Westmoreland's position was filled by similarly qualified applicants outside her protected class, it could still conclude that "the position remained open." *Hill*, 354 F.3d at 285 (citing *Brinkley*, 180 F.3d 598, 607). As noted, the County states that "Westmoreland's actual position was abolished at the Academy when she left." Doc. No. 55-2 at 26 (citing Doc. No. 55-34 ¶ 26). Although abolishing a position contrasts with holding it open, both actions may qualify as circumstances "which give rise to an inference of unlawful discrimination." *See Burdine*, 450 U.S. at 253. For instance, in conjunction with the other evidence, a reasonable juror could conclude that the County abolished Westmoreland's position to put the kibosh on any efforts to replace her with a white male lest it incur Title VII liability. After all, certain Department officials have demonstrated a rudimentary knowledge of Title VII law. *See* Doc. No. 57-15 at 2–4. Put differently, it would not be unreasonable for a jury to infer that the Department deemed the detriment of holding Westmoreland's position open— thereby potentially incurring liability—to outweigh the loss accompanying the abolition of an otherwise needed position. While, on its face, such reasoning may not resemble a model of rationality, the Court is mindful that invidious discrimination does not always grow from rational roots. *Cf. Castaneda v. Partida*, 430 U.S. 482, 499 (1977) (noting the "many facets" of human motivation). It is the jury's bailiwick to weigh the evidence and decide whether it ultimately warrants such inferences.

The foregoing discussion demonstrates that a reasonable juror could conclude that Westmoreland has stated a prima facie case for sex and race discrimination under the disparate treatment model. The Court proceeds to address whether the County has articulated a nondiscriminatory reason for the allegedly adverse transfer.

b.      Nondiscriminatory Reason

Under the *McDonnell-Douglas* framework, "[i]f a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. This burden of production requires the employer to "'clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citing *Burdine*, 450 U.S. at 254–55 & n.8)).

The County proffers two nondiscriminatory reasons to justify its transfer of Westmoreland to Station 40. The first centers on Westmoreland's alleged involvement in the cheating scandal and various negative incidents the County alleges to have resulted from such involvement. *See, e.g.*, Doc. No. 7-4, Ex. 2.15 (negative media coverage); *id.*, Ex. 2.22 (loss of ATRA certification). The second concerns inappropriate remarks Westmoreland allegedly made to recruits that the County contends caused disruption, loss of morale, and loss of cohesion among instructors and recruits. *See, e.g.*, *id.*, Ex. 1.11.

Based on this evidence, the County has proffered nondiscriminatory reasons for its transfer of Westmoreland. Although Westmoreland appears to deny involvement in the cheating scandal, a reasonable jury could believe the County's evidence that Westmoreland played a role in said scandal. Likewise, the County's evidence concerning Westmoreland's allegedly inappropriate remarks qualifies as a nondiscriminatory reason. Westmoreland does not argue that this evidence is inadmissible. Accordingly, the County has proffered nondiscriminatory reasons sufficient to satisfy step two of the *McDonnell-Douglas* evidentiary framework.

c.      Pretext

Where the employer articulates a nondiscriminatory reason for the adverse employment action, "'the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*.'" *Hill*, 354 F.3d at 285 (alterations in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)). "In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves*, 530 U.S. at 143).

In this case, the record contains evidence from which one could infer that Westmoreland committed no wrongdoing in connection with the cheating scandal. *See* Doc. No. 7-4, Ex. 1 ¶¶ 9–10, 30; Doc. No. 55-6 at 10; Doc. No. 57-3 at 29; Doc. No. 57-16 at 2. Thus, although the County insists that Westmoreland was involved in the scandal, a reasonable juror could infer that one of the County's nondiscriminatory reasons—that it transferred Westmoreland for participating in the cheating scandal—is false. It is well-established that "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," "especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves*, 530 U.S. at 147–48 (citations and internal quotation marks omitted). Therefore, Westmoreland has adduced sufficient evidence to satisfy step three of the *McDonnell Douglas* framework.

Westmoreland has also presented evidence from which a reasonable jury could infer that the County treated her less favorably than other persons outside her protected classes. For instance, the record reflects that, in addition to Westmoreland, the Department implicated Captain Kenneth Tucker (BM), Lieutenant Denise Dickens (WF), and James McClelland, Jr.

(WM) in the cheating scandal. *See, e.g.*, Doc. No. 55-35 ¶ 15. The evidence further indicates that McClelland, Westmoreland, Tucker, and Dickens were instructors at the Academy. *See* Doc. No. 55-5 at 10; Doc. No. 55-27 ¶ 38. The Department charged Tucker for wrongdoing in connection with the scandal, after which he resigned. Of the remaining three individuals, the evidence suggests that Westmoreland is the only person to receive a transfer. Doc. No. 57-4 at 16; Doc. No. 57-5 at 13; Doc. No. 57-7 at 9.

Viewed in a light most favorable to Westmoreland, a reasonable juror could infer that Westmoreland received less favorable treatment in connection with the cheating incident than similarly situated white employees. Concededly, the County did not transfer Dickens for her alleged role in the cheating scandal, which arguably undercuts the inference that the transfer was owed to Westmoreland's sex. Yet Tucker, an African American, incurred disciplinary action. Although the County insists that Tucker was engaged in wrongdoing, thereby justifying the discipline he received, this fact is unresolved. Minimally, these facts support the inference that the Department treated African American instructors at the Academy differently during the cheating scandal. Such evidence, while not dispositive, is probative of discrimination in the context of intersectional claims. *See Jeffers*, 264 F. Supp.2d at 327 ("Relevant . . . evidence of such a claim includes evidence of discrimination against African Americans (regardless of gender) . . . ."). The County also insists that Westmoreland is similarly situated to neither McClelland nor Dickens. Examining the evidence through a lenient lens, however, a reasonable fact-finder could conclude that Westmoreland, Dickens, and McClelland were relatively high-ranking instructors at the Academy and thus no sound basis existed on which to treat them differently.

Beyond that, Westmoreland has produced an email in which Jones discusses the potential legal ramifications of transferring Westmoreland from the Academy. Doc. No. 57-15. In this email, Jones states, somewhat starkly, that "African American females are receiving adverse actions in this Department." *Id.* at 2. Similarly, Jones states that "<u>only African American Female employees</u> have received your memo stating that they were removed based on these allegations . . . . [T]here are males who are under investigation that have not been removed." *Id.* Construed favorably and coupled with the other evidence, a reasonable juror could infer from these statements that a discriminatory purpose animated the County's decision to transfer Westmoreland for her purported participation in the cheating incident.

Viewed in Westmoreland's favor, the record contains sufficient evidence for a reasonable juror to conclude that the County discriminated against her on account of her sex and race. Accordingly, the Court denies the County's Motion for Summary Judgment as to Ms. Westmoreland's intersectional claim for sex and racial discrimination.

3.    *Sex and racial discrimination—Mixed Motive*

The *McDonnell-Douglas* framework is not the sole route via which plaintiffs may establish sex or racial discrimination claims under Title VII. "Prior to enactment of the Civil Rights Act of 1991, the Supreme Court had recognized that adverse employment decisions could be motivated by both legitimate and discriminatory reasons." *Hill*, 354 F.3d at 284 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989), *superseded in part by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074). "To proceed under this mixed-motive theory, however, the plaintiff was required to offer direct evidence of discrimination." *Id.* "If the plaintiff was successful, the burden then shifted to the employer, who could escape liability by

proving that it would have made the same decision in the absence of the discriminatory motivation." *Id.* (citing *Price Waterhouse*, 490 U.S. at 276 (O'Connor, J., concurring)).

"In response to Price Waterhouse, Congress added § 2000e-2(m) to Title VII in the Civil Rights Act of 1991, providing that 'an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment action.'" *Id.* (quoting 42 U.S.C. § 2000e-2(m)). "The effect of the amendment was to eliminate the employer's ability to escape liability in Title VII mixed-motive cases by proving that it would have made the same decision in the absence of the discriminatory motivation." *Id.* "Rather, through such proof, the employer can now only limit the remedies available to the employee for the violation." *Id.* (citing 42 U.S.C. § 2000e-5(g)(2)(B)). "'On a claim in which an individual proves a violation under section 2000e-2(m)' and the employer 'demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor, the court . . . may grant declaratory relief, injunctive relief, and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m).'" *Id.* (alteration in original) (quoting 42 U.S.C. § 2000e-5(g)(2)(B)). However, the court "'shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment.'" *Id.* (quoting 42 U.S.C. § 2000e-5(g)(2)(B)).

In the wake of the Civil Rights Act of 1991, the Supreme Court has considered whether, consistent with *Price Waterhouse*, "direct evidence is required for a plaintiff to obtain a mixed-motive instruction under § 2000e-2(m)." *Id.* at 285 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)). The *Costa* Court rejected *Price Waterhouse*'s "'heightened showing through direct evidence.'" *Id.* (quoting *Costa*, 539 U.S. at 99). Rather, "a Title VII plaintiff 'need only demonstrat[e] that an employer used a forbidden consideration with respect to any employment

practice.'" *Id.* (alteration in original) (some internal quotation marks omitted) (quoting *Costa*, 539 U.S. at 98). Therefore, to obtain a mixed-motive instruction under § 2000e-2(m), "'a plaintiff need only present sufficient evidence,' direct or circumstantial, 'for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . [or] . . . sex . . . was a motivating factor for any employment practice.'" *Id.* (quoting *Costa*, 539 U.S. at 101).

In this case, as indicated above, Westmoreland has presented sufficient circumstantial evidence for a reasonable jury to conclude that sex and/or race motivated the County's decision to transfer her. Construing the evidence in Westmoreland's favor, it supports, inter alia, the following inferences: (1) at least one of the County's nondiscriminatory reasons is false; (2) the County treated her less favorably than similarly situated white employees in connection with the cheating scandal; and (3) the County knew that it was treating African-American females "adversely" in relation to the cheating scandal.

Indeed, creating a triable issue on the question of unlawful discrimination under the *McDonnell Douglas* framework would seem, ipso facto, to create a triable issue on the same under the mixed-motive framework. Under *McDonnell Douglas*, "[i]f a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. "Assuming the employer meets this burden of production, 'the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*.'" *Id.* (alteration in original) (quoting *Reeves*, 530 U.S. at 142–43). "At this point, the burden to demonstrate pretext 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Id.* (quoting *Burdine*, 450 U.S. at 256). The Court does not see wherein this burden is any greater than the burden that a mixed-motive plaintiff faces;

24

namely, the presentation of sufficient evidence, direct or circumstantial, for a reasonable jury to conclude by a preponderance of the evidence that an impermissible characteristic such as race or sex motivated the challenged practice. *See Hill*, 354 F.3d at 285. The *Hill* court stated as much:

> Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."

*Id.* at 286 (alteration in original) (quoting *Reeves*, 530 U.S. at 153). These considerations compel the conclusion that plaintiffs who create a triable issue on the question of unlawful discrimination under the *McDonnell Douglas* framework are, in the alternative, eligible for a mixed-motive instruction.

This is not to suggest that the converse is true; to wit, that plaintiffs who create a triable issue under the mixed-motive framework are, ipso facto, eligible to receive an instruction under the pretext framework. The Fourth Circuit has strongly suggested the opposite. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319 n.5 (4th Cir. 2005) (citing cases). It is simply to suggest that the pretext analysis represents a more rigorous rule than the mixed-motive analysis as it ordinarily obligates plaintiffs to prove that a single forbidden factor—to the exclusion of other factors—animated the employer's adverse action. *See* Avery et al., *supra*, at 151 (citing William R. Corbett, McDonnell Douglas, *1973–2003: May You Rest In Peace?*, 6 U. Pa. J. Lab. & Emp. L. 199, 213 (2003)). By contrast, the mixed-motive framework forces plaintiffs to prove only that a forbidden factor—notwithstanding the presence of permissible factors—caused the challenged conduct. *See, e.g.*, 42 U.S.C. § 2000e-2(m)). It requires no leap in logic to conclude

that evidence sufficient to establish that an impermissible characteristic was "the" motivation for the employer's adverse action equally suffices to show that an impermissible characteristic was "a" motivation for the same. Thus, Westmoreland is eligible for a mixed-motive instruction.

    *4.  Retaliation—McDonnell Douglass*

   "A plaintiff lacking direct evidence of retaliation may utilize the *McDonnell Douglas* . . . framework to prove a claim of retaliation." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). "In the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action." *Id.* "If the employer sets forth a legitimate, non-retaliatory explanation for the action, the plaintiff then must show that the employer's proffered reasons are pretextual or his claim will fail." *Id.* "More specifically, the plaintiff can prove pretext by showing that the 'explanation is "unworthy of credence" or by offering other forms of circumstantial evidence sufficiently probative of [retaliation].'" *Id.* (quoting *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004)).

   "To establish his prima facie case of retaliation, [Westmoreland] must show that [she] engaged in protected activity, that [the County] took adverse action against [her], and that a causal relationship existed between the protected activity and the adverse employment activity." *Id.* (citing *King v. Rumsfeld*, 328 F.3d 145, 150–51 (4th Cir. 2003)). The County concedes that, by filing an internal EEO complaint, Westmoreland engaged in protected activity. Therefore, the questions are (1) whether the County took adverse employment action against her and (2) whether a causal relationship exists between the protected activity and the adverse employment action.

A reasonable juror could conclude that the County took adverse action against Westmoreland based on the transfer to Station 40. The Court stated above that adversity for the purposes of Title VII's sex and race discrimination proscription (i.e. section 703(a)) represents a more stringent standard than adversity for the purposes of Title VII's retaliation provision (i.e. section 704(a)). The County concedes this point. Doc. No. 55-2 at 31.The Court then held that a reasonable juror could conclude that the transfer to Station 40 constituted an adverse action within the meaning of section 703(a). It follows a fortiori that a reasonable juror could conclude that the transfer amounted to a materially adverse action within the meaning of section 704(a). *See Burlington Northern*, 548 U.S. at 61–67; *see also id.* at 71 (holding that the reassignment of job duties may be materially adverse under section 704(a) depending on the circumstances of the particular case). Accordingly, Westmoreland has satisfied the second element of the prima facie case for her retaliation claim.

A reasonable juror could also conclude that a causal relationship exists between Westmoreland's filing of the EEO complaint and her transfer to Station 40. As a general matter, plaintiffs may demonstrate such a causal relationship via two evidentiary routes. First, plaintiffs may show that the adverse act bears sufficient temporal proximity to the protected activity. *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). Second, as this Court has consistently held, "plaintiffs may state a prima facie case of causation by relying on evidence other than, or in addition to, temporal proximity where such evidence is probative of causation." *Jenkins v. Gaylord Entm't Co.*, Civil Action Nos. 8:11–cv–02869–AW, 10–00633–AW, 2012 WL 11001, at *6 (D. Md. Jan. 3 2012) (citing cases); *see also, e.g.*, *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (holding that "other relevant evidence may be used to establish causation" where temporal proximity is missing).

In this case, Westmoreland filed her internal EEO complaint on June 30, 2006. On October 10, 2006, the Department notified her that it planned to transfer her effective October 18, 2006. Therefore, the transfer took place just over three months after Westmoreland engaged in protected activity. This proximity, in and of itself, is likely insufficient to satisfy the causation element of the prima facie case. *See Breeden*, 532 U.S. at 273 (suggesting that a "3-month period [is] insufficient"); *Pascual v. Lowe's Home Centers, Inc.*, 193 Fed. App'x 229, 233–34 (4th Cir. 2006) (holding that "three to four months" "is too long to establish a causal connection by temporal proximity alone"); *but see Cerberonics*, 871 F.2d at 457 (holding that proof that an employer fired an employee three months after the employee filed a charge of discrimination sufficed to state a prima facie case of causation).

All the same, Westmoreland has adduced other evidence probative of a retaliatory animus on the part of the County. As discussed above, the County attempted to transfer Westmoreland from the Academy almost immediately after she filed her internal EEO complaint. *See* Doc. No. 57-3 at 24–26; *see also* Doc. No. 7-4, Ex. 1 ¶ 23. Westmoreland also produced the email in which Jones discusses the potential legal implications of transferring her from the Academy. Doc. No. 57-15. Therein, to reiterate, Chief Jones states that "[t]he proximity of [Westmoreland]'s removal to the EEO grievance is a red flag to me." *Id.* at 2. Chief Jones also opines that "African American females are receiving adverse actions in this Department." *Id.* Construed in the light most favorable to Westmoreland, this circumstantial evidence is probative of a retaliatory animus.

The Court need not consider whether the abovementioned circumstantial evidence, per se, is sufficient to create a triable issue on the question of causation. As indicated, "plaintiffs may state a prima facie case of causation by relying on evidence other than, **or in addition to**,

28

temporal proximity where such evidence is probative of causation." *Jenkins*, 2012 WL 11001, at

*6 (emphasis added). Here, the Department transferred Westmoreland just over three months

after she complained about perceived discrimination. Westmoreland relies on this temporal

proximity in addition to the abovementioned circumstantial evidence. Although this temporal

proximity, per se, may fail to create a triable issue on the question of causation, it is probative of

the question of causation when considered in conjunction with the abovementioned

circumstantial evidence. As the D.C. Circuit has aptly explained,

> Those who do not take into account conditional probability are prone to making
>
> mistakes in judging evidence. They may think that if a particular fact does not
>
> itself prove the ultimate proposition . . . , the fact may be tossed aside and the next
>
> fact may be evaluated as if the first did not exist.

*Cf. Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) (citation omitted). Furthermore,

the fact that the at-issue temporal proximity (i.e. just over three months) is just beyond that

which suffices to state a prima facie case of causation fortifies its conditional force. For these

reasons, a reasonable juror could conclude that Westmoreland's lodging of the EEO complaint

led to her firing.

The Court need not conduct a separate analysis concerning steps two and three in the

*McDonnell Douglas* framework. Under step two, the County has proffered a nondiscriminatory

reason for the reasons stated in Part III.C.2.b, *supra*. As for step three, the record contains

adequate evidence for a reasonable juror to conclude that the County's nondiscriminatory

reasons are pretextual. Beyond the attempted transfer and Jones's email, the evidence includes

facts that arguably support the inference that Westmoreland received both an inordinate number

of disciplinary actions and an undeservedly unfavorable performance review in reprisal for her

EEO complaint. *See, e.g.*, Doc. No. 1-1 at 1; Doc. No. 57-3 at 68; Doc. No. 57-7 at 8–9. Hence, the Court denies the County's Motion for Summary Judgment in relation to Westmoreland's retaliation claim.

  5.  *Retaliation—Mixed Motive*

  In contrast to disparate treatment claims, to which 42 U.S.C. § 2000e-2(m)'s mixed-motive analysis applies, the *Price Waterhouse* mixed-motive analysis applies to retaliation claims. *See Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 342 (4th Cir. 2008) (citing *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 552 n.7 (4th Cir. 1999)). *Price Waterhouse* requires plaintiffs "to offer direct evidence of discrimination." *Hill*, 354 F.3d at 284 (citing *Price Waterhouse*, 490 U.S. at 276 (O'Connor, J., concurring)).

  In this case, Westmoreland has offered no direct evidence of discrimination. Nor does she make any pretense about having done so. Therefore, she is ineligible for a mixed-motive instruction on her retaliation claim.

  6.  *Hostile Work Environment*

  "In order to make out a hostile work environment claim based on sex, 'a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (4) was imputable to her employer.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) (quoting *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011)). The Court confines its analysis to elements (2) and (3). Furthermore, as it did with Westmoreland's disparate treatment claims, the Court treats Westmoreland's sexual harassment claim as an intersectional claim. There is ample authority for the propriety of this decision. *See supra* Part III.C.1; *see also, e.g.*, *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 174–78 (4th Cir. 2009)

(holding that genuine disputes of material fact precluded summary judgment on "gender- or race-based harassment claims); *Gates Rubber*, 833 F.2d at 1416 ("a trial court may aggregate evidence of racial hostility with evidence of sexual hostility" "in determining the pervasiveness of the harassment against a plaintiff").

        a.      "Because of" Sex

The leading Supreme Court case on the meaning of "because of" one's sex is *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998). The *Oncale* Court outlined three evidentiary routes whereby plaintiffs may essay to establish that alleged harassment is because of their sex. First, the employee may show that the challenged conduct is motivated by sexual desire. *See id.* at 80. Second, the employee may show that she "is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *See id.* Third, the employee may offer "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* at 80–81. Because the record is devoid of any lewd acts, inappropriate remarks, slurs, or other clear indicia of sexual desire or animus, Westmoreland avails herself of only the third route. The third route is the road less traveled in that it is generally the most exacting by which to establish the because of element. *Cf. Oncale*, 523 U.S. at 80–81; *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331–32 (4th Cir. 2003); *Davis v. Dimensions Health Corp.*, 639 F. Supp.2d 610, 614–15 (D. Md. 2009); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp.2d 1301, 1331 (N.D. Ga. 2001) (citation omitted).

In this case, Westmoreland's "direct comparative evidence" consists of essentially two items: (1) her alleged unfavorable treatment in relation to the cheating scandal; and (2) the Jones

memo stating that African-American females disproportionately received adverse actions in connection with the same incident.

Construed in the most favorable light, this evidence, albeit barely, suffices to permit a reasonable juror to infer that the transfer was due to Westmoreland's status as an African-American female. Granted, the County did not transfer Dickens. But, as explained above, the evidence arguably supports the inference that relatively high-ranking African Americans received unequal treatment in connection with the cheating scandal. The Court added that evidence of the mistreatment of an African-American male bears on the question whether the County discriminated against Westmoreland as an African-American female. *See supra* Part III.C.2.c (citing *Jeffers*, 264 F. Supp.2d at 327). Moreover, construed favorably, the testimony of at least one witness sustains the allegation that the Department treated African-American females disparately during the cheating scandal. Doc. No. 57-7 at 4. Accordingly, a reasonable juror could conclude that the transfer was attributable Westmoreland's status as an African-American female.

b.      Severe or Pervasive

Element (3) of the prima facie case for hostile work environment requires plaintiffs to show that the alleged harassment is severe or pervasive. Severe or pervasive sexual harassment "alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Courts make this determination by considering the totality of the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Courts customarily consider the following circumstances when determining whether the challenged conduct alters the conditions of employment and creates an abusive working environment: (1) its severity; (2) its frequency; (3) whether it is physically threatening

or humiliating; and (4) whether it unreasonably interferes with the employee's work performance. *See id.*

In this case, Westmoreland challenges the following actions as hostile: (1) the attempted transfer; (2) the permanent transfer; (3) unwarranted disciplinary charges; and (4) an undeservedly unfavorable performance review. The record, however, is barren of "direct comparative evidence" with respect to items (3) and (4). That is, Westmoreland has presented no evidence that the County gave employees outside her protected class undeservedly unfavorable performance reviews. Nor has she submitted evidence showing that employees outside her protected class received unwarranted disciplinary charges. As indicated, the attempted and ultimate transfers are the only complained-of conduct sharing a meaningful tie to Westmoreland's protected traits.

As a result, the Court faces the relatively restricted inquiry whether the attempted and ultimate transfers, in and of themselves, constitute severe or pervasive harassment. As common sense suggests, the answer to this question is no. Factors (1), (2), and (4) weigh heavily in favor of the County. As to factor (1), the attempted transfer amounted to no more than a minor inconvenience. Furthermore, although the ultimate transfer was arguably adverse, the Court knows of no authority proposing that an undesirable transfer constitutes severe harassment. Factor (2) also favors the government because the transfer was an isolated act. As for factor (4), Westmoreland fails to argue that the transfer unreasonably interfered with her work performance. Nor logically could she seeing that the transfer took place at the end, not during, her tenure at the Academy. Regarding factor (4), although one could plausibly perceive a transfer to a fire station as humiliating, Westmoreland makes no such argument. Even had she done so, such a contention would fail to counteract the force of the other factors. Westmoreland asserts that a handful of

other acts constitute harassment, such as an incident in which various people allegedly accused her of using a breathing apparatus incorrectly. Beyond bearing no meaningful relation to her sex, these events embody an enumeration of petty grievances. For these reasons, no reasonable juror could conclude that the challenged harassment was severe or pervasive. Consequently, the Court grants the County's Motion for Summary Judgment as to Westmoreland's hostile work environment claim.

IV.     **CONCLUSION**

    For the foregoing reasons, the Court **DENIES** Westmoreland's Motion to Strike and **GRANTS IN PART AND DENIES IN PART** the County's Motion for Summary Judgment. A separate Order follows.

_____June 25, 2012_____                        _____/s/_____
          Date                                          Alexander Williams, Jr.
                                                        United States District Judge