**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| PHYLLIS V. WESTMORELAND, | |
| Plaintiff, | |
| v. | Civil Action No. 09-CV-2453 AW |
| PRINCE GEORGE'S COUNTY, | |
| MARYLAND | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Phyllis M. Westmoreland brought this action against Defendant Prince George's County, Maryland. Plaintiff asserted claims for sex discrimination, racial discrimination, retaliation, and hostile work environment in violation of Title VII. Ultimately, Plaintiff prevailed on her retaliation claim at trial. In the wake of the trial, four motions are pending before the Court: (1) Defendant's Second Renewed Motion for Judgment as a Matter of Law and, in the Alternative, for New Trial and Remittitur (Second JNOV Motion); (2) Plaintiff's Motion for Attorney Fees and Costs (First Motion for Attorney Fees); (3) Plaintiff's Supplemental Motion for Attorney Fees and Costs (Supplemental Motion for Attorney Fees); and (4) Plaintiff's Second Motion for Attorney Fees and Costs (Second Motion for Attorney Fees). The Court has reviewed the entire record and deems a hearing unnecessary. For the reasons that follow, the Court **DENIES** Defendant's Second JNOV Motion and **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motions for Attorney Fees.

# I.   FACTUAL AND PROCEDURAL BACKGROUND

Prince George's County, Maryland (the County or Defendant) employed Plaintiff as a firefighter in its Fire and Emergency Medical Services Department (Department) from 1989 until December 2009. Plaintiff is an African-American female. The Department is integrated; many of the relevant decision makers are African American.

Plaintiff worked as a firefighter and EMT until 2003. At that time, she was transferred to the Office of Professional and Career Development (the Academy), where her duties were more administrative in nature. In 2006, she was promoted to lieutenant. All the performance reviews Plaintiff received in the period leading up to 2006 were glowing.

The Academy contains a division called Officer Candidate School (OCS). Among other things, OCS is responsible for administering promotional exams. Plaintiff attended OCS in 2006. Although Plaintiff testifies that she had instructional duties at the Academy, she states that she was a student for the purposes of OCS. In April 2006, a promotional test was administered in OCS and Plaintiff was slated to take it. The Department alleged that Plaintiff cheated on the exam by submitting a blank answer sheet. Plaintiff vehemently denied this allegation, asserting that an instructor told her and the rest of the students to put their names on a blank sheet and to turn it in. Plaintiff also asserts that she was the only student at OCS to receive disciplinary action for allegedly cheating on the test. Although the Department made a factual finding that Plaintiff cheated or attempted to cheat on the test, it dismissed the charges against Plaintiff on procedural grounds.

In June 30, 2006, Plaintiff filed an internal EEO complaint alleging discrimination.[1] On or around July 3, 2006, the Department tried to transfer her from the Academy to a fire station (Station 40). The transfer was rescinded, partly on the advice of an internal EEO official who

---

[1] The County has conceded that this act constituted protected activity.

opined that the proximity of the transfer to Plaintiff's complaint raised a red flag and that African-American females were disproportionately receiving adverse actions. In mid-October 2006, Plaintiff was transferred to Station 40 per the orders of Fire Chief Lawrence Sedgwick (Chief Sedgwick). Plaintiff received several disciplinary actions when she arrived at Station 40. She also received a satisfactory-to-negative performance review that corresponded to the time in which she complained about discrimination. After working at Station 40 for around three years, Plaintiff voluntarily retired from the Department in 2009 with the rank of lieutenant.

In September 2009, Plaintiff filed a Complaint in this Court. (ECF No. 1.) On September 2, 2010, Plaintiff filed an eight-count Amended Complaint alleging: (1) gender discrimination based on discriminatory request for transfer; (2) race discrimination based on discriminatory request for transfer; (3) gender discrimination based on discriminatory reassignment to Station 40; (4) race discrimination based on discriminatory reassignment to Station 40; (5) gender discrimination based on failure to investigate; (6) race discrimination based on failure to investigate; (7) retaliation based on transfer out of the Academy; and (8) hostile work environment based on gender. (ECF No. 26.) The County subsequently moved to dismiss Counts 5, 6, and 8. On August 31, 2011, the Court issued an Opinion and Order denying the County's motion. (ECF Nos. 51, 52.) The County filed a Motion for Summary Judgment on February 15, 2012. (ECF No. 55.) On June 26, 2012, the Court issued another Opinion and Order granting in part and denying in part the County's Motion for Summary Judgment. (ECF No. 63.) The Court granted summary judgment for Defendant on Plaintiff's claims alleging disparate treatment arising out of her attempted transfer and the County's alleged failure to investigate, reasoning that these acts did not constitute adverse actions. The Court also granted summary judgment for Defendant on Plaintiff's hostile work environment claim, concluding that her attempted transfer,

transfer, disciplinary charges, and unfavorable performance appraisal did not constitute severe and pervasive conduct. Accordingly, the case proceeded to trial on Plaintiff's two remaining claims: retaliation and disparate treatment based on her transfer to Station 40. A five-day jury trial was held. (ECF Nos. 86, 96.) The Court granted judgment at the close of the evidence for Defendant on Plaintiff's claim of disparate treatment based on gender and race. (ECF No. 91.)

On April 12, 2013, the jury returned a verdict finding the County liable to Plaintiff for retaliation in violation of Title VII and awarding her $350,000. (ECF No. 102.) On April 15, 2013, the Court notified the parties of its intent to reduce the verdict to the statutory cap of $300,000. (ECF No. 100.) In addition, the Court entered an Order declining to award backpay and front pay. (ECF No. 105.) Judgment was entered in this case on April 22, 2013 in the amount of $300,000. (ECF No. 106.) The County filed its First Motion for Attorney Fees and Costs three days after the entry of the Judgment. (ECF No. 107.).

On May 20, 2013, the County filed its Renewed Motion for Judgment as a Matter of Law and, in the Alternative, for New Trial and Remittitur (First JNOV Motion). (ECF No. 111.) Plaintiff opposed this Motion. (ECF No. 113.) When the original Motion was filed, neither side had obtained the trial transcript. The Court issued an Order dated July 15, 2013 directing the County to order and file the transcript of the trial proceedings. (ECF No. 120.) On August 11, 2013, the transcript was filed with the clerk's office. (ECF Nos. 121 – 125.) The County has submitted its Second JNOV Motion in accordance with the Court's instructions.

In the meantime, on June 6, 2013, Plaintiff filed her Supplemental Motion for Attorney Fees. (ECF No. 115.) On September 19, 2013, Plaintiff filed a Second Motion for Attorney Fees. (ECF No. 130.)

## II.   STANDARD OF REVIEW

### A.   Rule 50(b)

A district court will not disturb a decision denying a motion for judgment as a matter of law under Rule 50(b) "unless, without weighing the evidence or assessing witness credibility, [the court] concludes that reasonable people could have returned a verdict **only** for defendants." *Cooper v. Dyke*, 814 F. 2d 941, 944 (4th Cir. 1987) (emphasis added) (citation omitted). In making this determination, courts must "view the evidence, and all reasonable inferences [therefrom], in the light most favorable to the prevailing party." *Randall v. Prince George's County, Md.*, 302 F.3d 188, 201 (4th Cir. 2002) (citation omitted); *see also Cooper*, 814 F.2d at 944.

### B.   Rule 59(e)

The Fourth Circuit has recognized that there are three grounds for amending an earlier judgment under Rule 59(e): "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (citation omitted). Generally, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Id.* (citation and internal quotation marks omitted).

### C.   Rule 59(a)

Rule 59(a) provides that courts may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Under this standard, "[a] new trial will be granted if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the

direction of a verdict." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (citation and internal quotation marks omitted). In making this determination, courts may "weigh the evidence and consider the credibility of witnesses." *Id.* (citation omitted).

## III.    LEGAL ANALYSIS

### A.    Rule 50(b)

Plaintiff has filed a second renewed motion for judgment as a matter of law pursuant to Rule 50(b). The essential question the Court faces is whether a reasonable jury could have returned a verdict only for Defendant on Plaintiff's retaliation claim.

Plaintiff did not present direct evidence of retaliation at trial. Therefore, the Court analyzes her retaliation claim under the pretext framework. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (citation omitted).

"In the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action." *Id.* "If the employer sets forth a legitimate, non-retaliatory explanation for the action, the plaintiff then must show that the employer's proffered reasons are pretextual or his claim will fail." *Id.* "More specifically, the plaintiff can prove pretext by showing that the 'explanation is "unworthy of credence" or by offering other forms of circumstantial evidence sufficiently probative of [retaliation].'" *Id.* (alteration in original) (citation omitted).

"To establish [her] prima facie case of retaliation, [Plaintiff] must show that [she] engaged in protected activity, that [the County] took adverse action against [her], and that a causal relationship existed between the protected activity and the adverse employment activity." *Id.* (citation omitted). The County concedes that, by filing an internal EEO complaint, Plaintiff

engaged in protected activity. Therefore, the questions are (1) whether the County took adverse employment action against her; and (2) whether a causal relationship exists between the protected activity and the adverse employment action.

The Supreme Court has enunciated the test for adversity within the meaning of Title VII's antiretaliation provision. *See generally Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). For an act to be adverse within the meaning of Title VII's antiretaliation provision, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation and internal quotation marks omitted). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.* (citation omitted).

Specifically, the reassignment of job duties may also constitute a materially adverse action. *See id.* at 71; *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). Courts consider all the relevant circumstances to determine whether the reassignment of job duties constitutes a materially adverse action. *See Burlington*, 548 U.S. at 71. Such circumstances include, but are not limited to, whether the new position is more arduous than the old position; whether the new position is more prestigious; and whether the new position is objectively considered a better job. *See id.* Furthermore, a retaliatory downgrade of a performance evaluation may "[a]ffect a term, condition, or benefit of employment." *See Von Gunten v. Maryland*, 243 F.3d 858, 867 (4th Cir. 2001) (citation omitted), *abrogated on other grounds by Burlington*, 548 U.S. 53.

As a general matter, plaintiffs may demonstrate that the employee's engagement in protected activity caused the materially adverse action via two evidentiary routes. First, plaintiffs may show that the adverse act bears sufficient temporal proximity to the protected activity. *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). Mere temporal proximity between the protected activity and the materially adverse action suffices to establish a prima facie case of causation only where it is "very close." *Id.* at 273 (citation and internal quotation marks omitted). Although the Supreme Court has not defined "very close," *Breeden* suggests that a "3-month period is insufficient." *See id.* (citation and internal quotation marks omitted). Second, as this Court has consistently held, "plaintiffs may state a prima facie case of causation by relying on evidence other than, or in addition to, temporal proximity where such evidence is probative of causation." *Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 881 (D. Md. 2012) (citing cases); *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (holding that "other relevant evidence may be used to establish causation" where temporal proximity is missing).

In this case, a reasonable jury could have returned a verdict for Plaintiff on her retaliation claim. Plaintiff submitted enough evidence for a reasonable juror to conclude that the transfer from the Academy to Station 40 was materially adverse. Plaintiff testified that the transfer significantly increased her work hours, changed her duties and responsibilities, caused her child care problems, interfered with her educational and career opportunities, and caused her a lot of stress. *See* Doc. No. 121 at 71–75. Specifically, Plaintiff testified that she would have to return to the field, *see id.* at 71; that her work day would increase from 8 to 24 hours, *see id.*; that the increase in hours would encumber her ability to care for her children, who were aged six and seven at the time, and whose father was also a firefighter working a 24-hour shift, *see id.* at 71–

72; and that the increased hours interfered with her ability to attend college, which was a part of her Individual Development Plan with the Academy, *see id.* at 72–74. Based on these circumstances, a reasonable juror could have concluded that the change in Plaintiff's work schedule made an enormous difference in her life. A reasonable juror could also have concluded that Plaintiff's duties at Station 40, which involved riding rescue vehicles and responding to emergencies, were significantly more arduous and stressful than her duties at the Academy. *See* Doc. No. 121 at 39 (describing typical duties at a fire station). Plaintiff also submitted evidence that, after receiving sterling performance appraisals throughout her tenure as a firefighter, she received a satisfactory/negative performance appraisal for the evaluation period coinciding with her protected activity. *See* Doc. No. 121 at 47–48, 51–52, 77–79. One could rationally conclude that the threat of receiving a negative performance review would dissuade an employee from complaining about discrimination where the employee has received only outstanding performance reviews for years. Accordingly, based on all the relevant circumstances, a reasonable jury could conclude that the transfer to Station 40 was materially adverse.

Defendant argues that Plaintiff failed to show that her transfer was a materially adverse action for two primary reasons. First, Defendant asserts that Plaintiff received the same, if not more, salary and benefits. Second, Defendant argues that, because Plaintiff's job status remained the same and no loss of prestige was associated with the transfer, the transfer amounted to an undesirable reassignment at most.

These arguments are flawed in several respects. First, they require the Court to weigh the evidence. However, courts do not weigh the evidence when ruling on Rule 50(b) motions. Defendant's arguments are also substantively unsound. The apparent fact that Plaintiff received the same pay and benefits at Station 40 does not mean that the action could not be materially

adverse. The question is whether it would deter a reasonable person from making or supporting a charge of discrimination. For the reasons stated above, despite the pay parity, a reasonable juror could so find. Furthermore, although Defendant adds that Plaintiff received more pay at Station 40, the evidence does not compel this conclusion. Through the testimony of Department employee Denise Dickens, Defendant offered Trial Exhibit 12 to prove that Plaintiff received more pay at Station 40 than at the Academy. However, on cross-examination of Dickens, counsel for Plaintiff pointed out several inconsistencies in Exhibit 12 that casted doubt on its validity. *See* Doc. No. 123 at 143–49. Even Dickens conceded that she did not prepare the document alone, that some of its information was "not possible," and that it contained some "typographical errors." *See* Doc. No. 123 at 143, 146, 149. Therefore, a rational factfinder could have given this document no weight. As there was no other evidence that Plaintiff earned more money at Station 40, one reasonably could have concluded that Plaintiff did not earn higher pay at Station 40. Even assuming that Plaintiff did earn significantly more overtime at Station 40, this fact would have some tendency to corroborate Plaintiff's testimony that she worked longer hours at Station 40. Therefore, the fact that Plaintiff received the same, and conceivably more, pay at Station 40 does not foreclose the finding of materially adverse action.

The Court also finds unconvincing the argument that there was no material adversity because Plaintiff's job status remained the same and because she lost no prestige. One could infer that, at least at times, Plaintiff was an instructor at the Academy. *See, e.g.*, Doc. No. 123 at 27, 66–67, 143. Furthermore, although Dickens felt that working as a traditional firefighter at the station was generally a better job with more potential for advancement, Dickens testified that the experience at the Academy was "definitely unique" because it allowed people at the Academy to "give back to the new employees coming in." *See* Doc. No. 123 at 135. Defendant would

respond that a mere change in duties is insufficient to show material adversity. The only controlling case on which Defendant relies to support this proposition is *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir. 2004). But *James* is inapposite because it addressed Title VII's antidiscrimination provision, not its antiretaliation provision. *See id.* at 376 n.2. Moreover, *James* predates the Supreme Court's decision in *Burlington*, in which it enunciated the material adversity standard. This fact is critical because adversity for the purposes of Title VII's antidiscrimination provision represents a higher standard than adversity within the meaning of Title VII's antiretaliation provision. *See Burlington*, 548 U.S. at 61–67; *see also Lettieri*, 478 F.3d at 650 n.2. Thus, to reiterate, the real issue is whether the transfer would have dissuaded a reasonable worker from complaining about discrimination. The fact that Plaintiff's official job classification remained the same is obviously not dispositive of this inquiry. For good measure, Defendant has not even addressed the significance of Plaintiff's aberrational negative performance review and its correspondence with her complaint of discrimination. Accordingly, Defendant's counterarguments lack merit.

Plaintiff also submitted sufficient evidence for a reasonable jury to conclude that she stated a prima facie case of causation. Plaintiff filed her EEO complaint on June 30, 2006. Doc. No. 121 at 52–53. Plaintiff was notified of her transfer on October 10, 2006 and it became effective on or around October 17, 2006. *See* Doc. No. 121 at 69; Doc. No. 124 at 9. This temporal proximity (3.5 months), standing alone, is insufficient to state a prima facie case of causation. However, Plaintiff adduced other evidence probative of causation. On or about July 3, 2006, Plaintiff received a transfer memo from the Academy. *See* Doc. No. 122 at 50. Although the transfer was later halted, the memo halting the transfer states that the proximity of Plaintiff's transfer to her filing of the EEO complaint raises a red flag and that African-American females

were disproportionately receiving adverse actions. Doc. No. 122 at 55–56. Furthermore, Lieutenant Carla Blue testified that Major Chauncey Bowers and Chief Sedgwick attempted or contemplated transferring Plaintiff from the Academy on several occasions between July 3, 2006 and the mid-October 2006 transfer. *See* Doc. No. 123 at 9, 12. At least in part, the testimony of EEO officer Eugene Jones corroborates Blue's testimony. *See* Doc. No. 123 at 184 (testifying that Major Bowers tried to transfer Plaintiff in August 2006); *id.* at 199–200 (testifying that Blue attempted to block certain transfer attempts). Based on these facts, Plaintiff adduced adequate evidence to state a prima facie case that there was a causal link between her June 30, 2006 EEO complaint and her mid-October 2006 transfer.

Defendant has set forth several nonretaliatory reasons wherefore it transferred Plaintiff to Station 40. Perhaps its primary justification is that Plaintiff was allegedly involved in a cheating scandal that caused the Department negative publicity, low morale, and the loss of training certification. Defendant also argues that Plaintiff created conflicts with her coworkers. To prove the later proposition, Defendant seems to focus on Plaintiff's filing of "baseless" EEO charges.

As at least some of these reasons are facially neutral, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] [retaliation] vel non." *Westmoreland v. Prince George's County, Md.*, 876 F. Supp. 2d 594, 609 (D. Md. 2012) (citation and internal quotation marks omitted). "In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for [retaliation]." *Id.* (citation and internal quotation marks omitted). "It is well-established that it is *permissible* for the trier of fact to infer the ultimate fact of [retaliation] from the falsity of the employer's explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Westmoreland*,

876 F. Supp. 2d at 609 (citation and internal quotation marks omitted). "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated]." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

"This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability." "[T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was [retaliatory]." *Id.* "For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, [nonretaliatory] reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no [retaliation] had occurred." *Id.* (citations and internal quotation marks omitted).

Thus, "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors." *Id.* at 148. "Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49. Ultimately, the plaintiff must prove by a preponderance of the evidence that the protected activity was the but-for cause of the materially adverse action. *See Univ. of Tex. Se. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

In this case, Plaintiff submitted sufficient evidence for a reasonable juror to conclude by a preponderance of the evidence that Defendant's nonretaliatory reasons were pretexts for retaliation. As noted, Defendant tried to transfer Plaintiff from the Academy just a few days after

she complained about discrimination. Although the transfer was halted, the memo suggesting that it be halted acknowledged the proximity of the action to Plaintiff's complaint and stated that African-American females were receiving disparate actions in the Department. Defendant seems to argue that the testimony of Jones, who wrote the memo, conclusively establishes that he issued it in the interest of caution and to ensure a proper investigation. While this may be true, Jones's testimony indicates that Samuel Gross, Assistant Director at the Academy, and/or Chief Sedgwick initiated efforts to transfer Plaintiff out of the Academy on or around July 3, 2006. *See, e.g.*, Doc. No. 123 at 158, 161. Yet Gross did not testify, and Sedgwick did not explain why these initial efforts were made to transfer Plaintiff. Furthermore, Blue testified that Bowers and Sedgwick made or contemplated several attempts to transfer Plaintiff from the Academy in the period between her EEO complaint and ultimate transfer, and Jones corroborated this testimony in part. There is no evidence explaining why additional attempts were made to transfer Plaintiff from the Academy during the pendency of Jones's investigation. Although this is perhaps insufficient evidence to carry the ultimate burden of proving that Plaintiff's filing of the EEO charge was the but-for cause of her transfer to Station 40, it is certainly sufficient to state a strong prima facie case.

But that is not the only evidence probative of causation. In October 2006, shortly after Plaintiff was transferred to Station 40, Plaintiff received a "Step III" disciplinary action, which she testified was the most serious level of discipline. *See* Doc. No. 121 at 86–88. Plaintiff received at least two more disciplinary actions after being transferred to Station 40. *See* Doc. No. 121 at 90, 92. Although the timing of the second and third disciplinary actions is not entirely clear, the evidence indicates that at least one of them occurred in November/December 2006. *See* Doc. No. 121 at 90; Doc. No. 126-2 at 16–18 (citations omitted). According to Plaintiff, the third

disciplinary action occurred no later than March 2007. *See* Doc. No. 121 at 92. One of these actions involved the allegation that Plaintiff falsely stated that a recruit named Craig Smith had made a sexual remark regarding Black women. However, the disciplinary action based on this allegation was later dismissed, and Blue testified that the allegation that Plaintiff's statement was untrue was later disproved. *See* Doc. No. 123 at 15–18. Although the testimony of Jones may suggest otherwise, the jury was free to believe Blue and disbelieve Jones. Likewise, although a Department investigator found that Plaintiff cheated in connection with the OCS promotional test by submitting a blank answer sheet, the charges were dismissed, and Plaintiff explicitly denied cheating and explained that Captain Kenneth Tucker had every student submit blank answer sheets. Plaintiff also testified that she was the only student who was accused of cheating on the exam. *See* Doc. No. 121 at 45–47, 50. Defendant asserts that Plaintiff was an instructor, thereby justifying the disparity in treatment from the rest of the class. However, Plaintiff testified that she was a student for the purpose of the test and was simply following Tucker's orders like the other students. There is evidence from which one could infer that Plaintiff acted as a student at the Academy at times, such as in relation to OCS. *See, e.g.*, Doc. No. 123 at 131, 143.

Based on this testimony, a reasonable juror could conclude that Plaintiff did not cheat on the promotional test and did not make false accusations about Smith, which may suggest that Defendant proffered these facially neutral reasons to mask a retaliatory motive. Granted, Defendant also submitted evidence that the cheating scandal caused the loss of training certification and low morale. But because the evidence is sufficient to conclude that Plaintiff did not cheat on the promotional test, the nexus between these two justifications and Plaintiff's transfer is unapparent. Furthermore, while Defendant adduced evidence of a general atmosphere of hostility at the Academy, the jury was free to believe that Plaintiff was not responsible for this

atmosphere or that Defendant was exaggerating the magnitude of the tension. Defendant also seems to argue that the dismissal of Plaintiff's "baseless" EEO complaints proves that Plaintiff was overly confrontational at the Academy. But this argument, if anything, harms Defendant's case; removing Plaintiff from the Academy based on EEO activity may suggest a retaliatory motive. Therefore, there is sufficient evidence to conclude that Defendant's nonretaliatory reasons are unworthy of credence, from which a rational jury could conclude that Defendant proffered them as a pretext for retaliation.

The record contains additional evidence from which one could rationally infer a retaliatory motive. As noted, Plaintiff submitted evidence that she received a negative performance appraisal after she complained about discrimination. The performance review corresponded to the period in which Plaintiff filed the EEO complaint in question. Furthermore, Plaintiff submitted unrefuted evidence that she had received only positive performance reviews before complaining about discrimination. Defendant has not responded to the significance of this discrepancy.

For these reasons, Plaintiff has presented enough evidence for a reasonable jury to conclude that her June 30, 2006 filing of the EEO complaint was the but-for cause of her mid-October 2006 transfer to Station 40. Although the 3.5-month span between these two acts is insufficient per se to prove causation, there is evidence of a recurring retaliatory animus that is probative of retaliation in its own right. Furthermore, coupled with the evidence of recurring retaliatory animus, temporal proximity of 3.5 months is probative of retaliation. *See Westmoreland*, 876 F. Supp. 2d at 614 (citation omitted) (discussing the concept of conditional probability). Accordingly, Plaintiff has submitted sufficient evidence to prove her Title VII

retaliation claim by a preponderance of the evidence. As a result, the Court denies Defendant's Rule 50(b) motion.

**B.     Rule 59(e)**

Defendant has also moved for relief from the Court's Judgment under Rule 59(e). Defendant argues that reconsideration under Rule 59(e) is proper because (1) there has been an intervening change in controlling law and (2) doing so is necessary to correct a clear error of law and/or to prevent manifest injustice. All of these assertions are without merit.

Defendant argues that the Supreme Court's decision in *Nassar* constitutes an intervening change in controlling law. As stated, the *Nassar* Court held that, to prevail on a Title VII retaliation claim, the plaintiff must prove by a preponderance of the evidence that the protected activity was the but-for cause of the materially adverse action. *See Nassar*, 133 S. Ct. at 2534. There is no dispute that the Supreme Court decided *Nassar* after the Court entered its Judgment. Therefore, the question is whether it constitutes a change in controlling law.

Defendant argues that *Nassar* constitutes a change in controlling law because the Court's jury instruction on causation is inconsistent with *Nassar*'s holding. With respect to causation, the Court instructed the jury as follows: "Ultimately, you must decide whether Plaintiff's filing of the EEO charge complaining about discrimination had a determinative effect on Defendant's decision to transfer her. 'Determinative effect' means that, if not for Plaintiff's filing of the EEO charge, the transfer to Station 40 would not have occurred." Doc. No. 97 at 15. Defendant adds that the word "determinative" is confusing and cites for this assertion *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).

The Fourth Circuit "reviews a district court's jury instructions decision for an abuse of discretion." *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013) (citation omitted). "In

reviewing the adequacy of jury instructions, [one must] determine whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the [moving] party." *Id.* (citation and internal quotation marks omitted).

In this case, the Court's jury instruction on causation adequately informed the jury of the but-for causation standard as stated in *Nassar*. The first part of the instruction says that "you must decide whether Plaintiff's filing of the EEO charge complaining about discrimination had a **determinative effect** on Defendant's decision to transfer her." Doc. No. 97 at 15 (emphasis added). The Supreme Court has suggested that the term "determinative influence," which is synonymous with "determinative effect," is coextensive with but-for causation. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (citing *Hazen Paper*, 507 U.S. at 610). Although Defendant argues that *Hazen Paper*'s discussion of the term "determinative influence" suggests otherwise, Defendant's argument is inconsistent with the *Gross* Court's reading of *Hazen Paper*. Likewise, the Fourth Circuit has held that the phrase "determinative factor" represents the appropriate causation standard in pretext cases. *Fuller v. Phipps*, 67 F.3d 1137, 1144 (4th Cir. 1995), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Numerous other circuit courts "have equated 'determinative influence' with 'but-for' causation between the protected trait and the adverse employment decision, that is, that the adverse employment decision would not have been made if the protected trait were not considered." *See, e.g.*, *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 718–19 (6th Cir. 2006) (citing cases).

Furthermore, Defendant ignores the second part of the Court's jury instruction. It states, "'Determinative effect' means that, if not for Plaintiff's filing of the EEO charge, the transfer to Station 40 would not have occurred." Assuming that the term "determinative effect" as used in

the first part of the jury instruction failed to adequately inform the jury of the but-for standard, the second part of the instruction, by defining this term, unquestionably apprised the jury of the but-for standard. Accordingly, the Court's jury instruction on causation was not erroneous.

Defendant also argues that the Court should grant its Rule 59(e) motion to correct a clear error of law and/or to prevent manifest injustice. However, other than the mistaken notion that the court's jury instruction on causation was erroneous, Defendant does not make any arguments to support this assertion. In any event, Defendant has identified neither a clear error of law nor a manifest injustice warranting the extraordinary remedy of reconsideration of a final judgment. Accordingly, the Court denies Plaintiff's Rule 59(e) motion.

**C.     Rule 59(a)**

Defendant also moves for a new trial under Rule 59(a). Defendant sets forth three bases for relief under Rule 59(a). First, Defendant argues that a jury note shows that the jury disregarded the jury instructions. Second, Defendant argues that the jury's verdict finding retaliation is against the manifest weight of the evidence. Third, in the alternative, Defendant argues that the Court should remit the $300,000 award of compensatory damages.

*1.     The Jury Note*

The jury note in question states as follows:

For question 19, can we consider the disciplinary actions conducted on October 18, 2006 as retaliation outside the context of the transfer? In other words[,] if we can't decide that the transfer to [Station 40] would have occurred outside the EEOC complaint, can we ask if the disciplinary charges would have occurred?

Doc. No. 98 at 2.

In response to this note, the Court instructed the jury as follows: "The question just submitted to the court is not clear, and the court is unable to answer the question as [phrased]. The jury is directed back to instructions 18 and 19. The jury is [further] instructed to apply those [instructions] to the facts and determinations made by the jury." *Id.* at 4. The jury did not ask the Court anything else about this issue or anything else at all.

Defendant argues that the jury's note shows that the jury disregarded Instructions 18 and 19. These Instructions directed the jury to find retaliation, if at all, based on the transfer to Station 40. Defendant further argues that these facts show that the jury was confused and decided that Defendant retaliated against Plaintiff based on the disciplinary action that Plaintiff received when she was transferred to Station 40. Accordingly, Defendant concludes that "the verdict is inconsistent and is against the weight of the evidence." Doc. No. 126-2 at 22.

This argument is unsound. The salient flaw in the argument is that it misconstrues the jury's note. Although the note is ambiguous, it means, if anything, that the jury was deliberating whether Plaintiff had proved but-for causation—i.e., whether Defendant would have transferred Plaintiff to Station 40 had she not filed the June 30, 2006 EEO complaint. The note also indicates that the jury was considering whether the disciplinary action that Plaintiff incurred right upon her transfer to Station 40 could be considered as retaliation for her filing of said EEO complaint. In response to the jury's note, the Court referred them back to Instructions 18 and 19, which make clear that the jury had to find whether Defendant retaliated against Plaintiff for filing the EEO complaint by transferring her to Station 40 and make no mention of the post-transfer disciplinary actions. *See* Doc. No. 97 at 14–15. The fact that the jury later rendered a verdict for Plaintiff lends itself only to the inference that the jury considered the jury instructions, to which Defendant raised no objection, and concluded that Plaintiff proved by a preponderance of the

evidence that Defendant would not have transferred her to Station 40 had she not filed the EEO complaint. Furthermore, generally speaking, it was perfectly appropriate for the jury to consider the significance of the post-transfer disciplinary actions because they were in evidence and, as explained above, are probative of causation. For these reasons, the Court declines to order a new trial based on the aforementioned jury note.

### 2. *Manifest Weight of the Evidence*

Defendant argues that the jury's verdict that it retaliated against Plaintiff was against the manifest weight of the evidence. To buttress this argument, Defendant incorporates by reference the arguments it made to support is Rule 50(b) motion. However, even though the Court did not have to accept Defendant's invitation to weigh the evidence with respect to the Rule 50(b) motion, it considered and rejected these arguments in Part III.A. With one exception, the Court declines to repeat its analysis here.

The exception is Plaintiff's Trial Exhibit 11. Exhibit 11 is an October 17, 2006 email from Chief Sedgwick in which he states the reasons for Plaintiff's transfer. Pertinently, the email states, "Please facilitate this lack of understanding so that [Plaintiff] is made aware that it is a result of an accumulation of events at the academy, **not just the recent allegations of EEO violation[s] between staff and recruits**." Doc. No. 126-5 at 2 (emphasis added); *see also* Doc. No. 123 at 13–14. Although the emphasized language is ambiguous, one could construe it as an acknowledgement that Plaintiff's EEO activity was a factor in Defendant's decision to transfer her. Blue interpreted the email this way. *See* Doc. No. 123 at 14, 43. Although Chief Sedgwick did not necessarily agree with this interpretation, he did not clearly dispute it either. *See* Doc. No. 124 at 8. In ruling on the Parties' various motions upon the close of the evidence, the Court stated that "[t]he chief was not . . . the best witness we had here" and observed that his testimony

exhibited "a lot of sloppiness." Doc. No. 124 at 84. The Court also recollects Chief Sedgwick has not having shown the steadiest demeanor during his testimony. In view of these observations, one can reasonably infer from the emphasized language that Sedgwick acknowledged that Plaintiff's filing of the EEO complaint was a factor in his decision. This deduction only strengthens the aforementioned conclusion that the jury's decision was not against the manifest weight of the evidence. Accordingly, the Court denies Defendant's Rule 59(a) motion as to this argument.

3.     *Remittitur*

A plaintiff who prevails on a Title VII retaliation claim is eligible for compensatory damages. *See* 42 U.S.C. § 1981a(a)(1). Compensatory damages are capped at $300,000 where, as here, the defendant "has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year . . . ." *Id.* § 1981a(b)(3)(D). Rule 59(a) empowers courts to order a new trial nisi remittitur where they conclude that "a jury award of compensatory damages is excessive." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 502 (4th Cir. 2007) (citation omitted). The Fourth Circuit reviews the capped amount for excessiveness because the capped amount represents the judgment. *See Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 620 (4th Cir. 2007). "The decision as to whether damages are excessive and should be subject to remittitur is entrusted to the sound discretion of the district court . . . ." *Robles v. Prince George's County, Md.*, 302 F.3d 262, 271 (4th Cir. 2002) (citation and internal quotation marks omitted). "A district court abuses its discretion only by upholding an award of damages when the jury's verdict is against the weight of the evidence or based on evidence which is false." *Sloane*, 510 F.3d at 502 (citation omitted). Here, there is no allegation or indication that relevant

evidence is false. Therefore, the question is whether the award of $300,000 in compensatory damages is against the manifest weight of the evidence.

"[A] plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546–47 (4th Cir. 2003) (citation omitted). "Such testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* (citation and internal quotation marks omitted). "The plaintiff must also show a causal connection between the violation and her emotional distress." *Id.* (citation and internal quotation marks omitted).

In this case, Plaintiff's evidence supports an award of $300,000 in compensatory damages. Although Plaintiff relies solely on her own testimony to establish emotional distress, Plaintiff testified that the transfer to Station 40 disappointed her; forced her to perform demanding traditional firefighter duties; interfered with her child care arrangements and Individual Development Plan; and caused her serious stress. *See* Doc. No. 121 at 70–75. Plaintiff also testified that she felt ostracized at Station 40 and was unhappy when she retired. *See* Doc. No. 121 at 93, 106. There is sufficient evidence to infer that the transfer to Station 40 caused her to suffer the alleged injuries from the time of her transfer until her voluntary retirement, which spans approximately three years. Although Defendant characterizes this testimony as conclusory, Plaintiff's testimony describes much more than trivial harm. *Cf. Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199–200 (4th Cir. 2000) (citation and internal quotation marks omitted) (stating that the issue of a plaintiff's credibility in an employment discrimination case is "quintessentially a question of fact for the jury").

The Court is aware of a line of cases suggesting that a plaintiff's testimony, standing alone, is generally insufficient to support a sizeable compensatory damages award. *See generally*

*Bryant*, 333 F.3d 536; *Saleh v. Upadhyay*, 11 F. App'x 241 (4th Cir. 2001); *Carter v. Barker*, Nos. 99-1433, 99-1438, 99-1439, 99-2382, 2000 WL 1008794 (4th Cir. July 21, 2000); *Cline*, 144 F.3d 294. These holdings do not rule the day here. Although it was a close case that could have gone either way, Plaintiff's testimony was sufficiently stable, her demeanor sufficiently steady, and her tone sufficiently sincere to establish significant suffering. *Cf. Hofmann v. O'Brien*, 367 F. App'x 439, 441 (4th Cir. 2010) (citation omitted) (courts may weigh the evidence and consider the credibility of witnesses when ruling on Rule 59(a) motions). Besides, the jury, as a microcosm of the community and deliberative body, was best positioned to measure the magnitude of Plaintiff's emotional harm, not a judge who substitutes his personal opinion for the jury's fact-finding or reviews a cold record on appeal. At the end of the day, the Court believes that it is the distinctive domain of the jury to divine the damage that wrongful retaliation wreaks, wherefore it declines to disturb its deliberative and collective wisdom. As it is, Plaintiff's $300,000 judgment shall stand.

**D.      Attorney Fees**

"In any action or proceeding under [Title VII] the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . ." 42 U.S.C. § 2000e-5. "Attorneys fees petitioners are considered 'prevailing parties' if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Arvinger v. Mayor & City Council of Balt.*, 31 F.3d 196, 200 (4th Cir. 1994) (citation and internal quotation marks omitted). "The purpose of awarding fees is to encourage attorneys to prosecute cases that vindicate the objectives of Title VII though they might be economically unattractive under a contingency fee arrangement." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 652

(4th Cir. 2002). "Fees should be high enough to encourage attorneys to take cases without awarding windfalls." *Id.* (citation omitted).

"In calculating attorney's fees, the Fourth Circuit employs the 'lodestar' formula, multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." *Id.* "In making the reasonableness determinations, a court is to use the twelve factor test articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)." *Id.* (citation omitted). The Fourth Circuit has thus articulated the *Johnson* factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Grissom v. The Mills Corp.*, 549 F.3d 313, 321 (4th Cir. 2008) (citation and internal quotation marks omitted). "When considering the *Johnson* factors, the court need not robotically list each factor nor comment on those factors that do not apply." *Bennett v. CSX Transp., Inc.*, 905 F. Supp. 2d 704, 708 (E.D.N.C. 2012) (citing *In re A.H. Robins Co.*, 86 F.3d 364, 376 (4th Cir. 1996)). What constitutes reasonable attorney fees is a discretionary inquiry. *Dennis*, 290 F.3d at 652 (citation omitted).

"[T]he most critical factor in calculating a reasonable fee award is the degree of success obtained; when a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998) (citation and internal quotation marks omitted). In other words, "[w]hen assessing whether to grant fees, . . . courts [must] consider the relationship between the fees and the degree of the plaintiff's success." *Sheppard v. Riverview Nursing Ctr., Inc.*, 88 F.3d 1332, 1336 (4th Cir. 1996) (citation omitted). However, a court may not "calculate an award of attorneys' fees by means of a purely mathematical comparison between the number of claims pressed and the number prevailed upon, [for such] a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors." *Brodziak*, 145 F.3d at 197 (citation and internal quotation marks omitted). "Rather, the appropriate inquiry concerns whether the claims on which the plaintiff prevailed are related to those on which he did not." *Id.* "When successful claims are unrelated to unsuccessful claims, it is not appropriate to award fees for the latter." *Id.* (citation omitted). But when all claims involve a common core of facts, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* (alteration in original) (citation and internal quotation marks omitted).

In this case, the Court will start by calculating the lodestar. In her First Motion for Attorney Fees, Plaintiff seeks $322,805 for 1,030.85 hours worked on this case by seven attorneys and two paralegals. In her Supplemental Motion for Attorney Fees, Plaintiff seeks $12,996.25 for 38.5 hours worked by one attorney and one paralegal on Plaintiff's Response to Defendant's First JNOV Motion and Reply to Defendant's Opposition to Plaintiff's First Motion for Attorney Fees. In her Second Motion for Attorney Fees, Plaintiff seeks $5,785 for 25.6 hours

worked by one attorney and one paralegal on Plaintiff's Response to Defendant's Second JNOV Motion and Reply to Defendant's Opposition to Plaintiff's Supplemental Motion for Attorney Fees. In sum, Plaintiff seeks $341,586.25 in attorney fees for 1094.95 hours worked on the case by attorneys and paralegals.

The first factor in the lodestar is the number of reasonable hours. Plaintiff submits time records for all the hours for which she seeks compensation. Although the records reflect that an appreciable amount of block-billing took place, they correspond to the procedural history of the case and are reasonably detailed overall. Defendant raises very few specific objections to the reasonableness of the hours worked by Plaintiff's attorneys and paralegals. For instance, Defendant asserts that Plaintiff's claim of 18.6 hours for her First Motion for Attorney Fees is unreasonable. However, this figure is not facially excessive given the length of the case and content of said Motion, and Defendant identifies no caselaw compelling a contrary conclusion. Defendant also argues that claiming 22.5 hours for the Response to the Second JNOV Motion is excessive because said Response tracks Plaintiff's Response to the First JNOV Motion. The Court agrees that the Response to the Second JNOV Motion tracks Plaintiff's Response to the First JNOV Motion. Furthermore, in failing to provide citations to the trial record in her Response to the First JNOV Motion, Plaintiff was partly to blame for the second round of briefing on the JNOV question. Therefore, taking all relevant circumstances into account, the Court halves the amount of attorney and paralegal time that Plaintiff may claim for her Response to the Second JNOV Motion to 4.9 attorney hours and 6.35 paralegal hours. As a result, the Court will calculate the lodestar based on a total of attorney and paralegal hours of 1083.7, give or take a hundredth of an hour. Although this amount of hours may lie at the boundary of what is reasonable for a case of this sort, it is within the ballpark of what courts have allowed in similar

Title VII cases. *See, e.g.*, *Depaoli*, 489 F.3d at 622–23 (approving attorney fees for victorious Title VII plaintiff in retaliation case based on 726.4 hours); *Warren v. Prejean*, 301 F.3d 893, 904 (8th Cir. 2002) (holding that district court did not abuse discretion in awarding attorney fees based on more than 800 hours where plaintiff prevailed on Title VII claims and received $150,000 in compensatory damages); *Olsen v. County of Nassau*, No. CV 05-3623(ETB), 2010 WL 376642, at *6–7 (E.D.N.Y. Jan. 26, 2010) (approving fee petition for approximately 1,500 hours where three plaintiffs prevailed on, inter alia, Title VII claims for gender discrimination and retaliation).

The next step in the lodestar is to determine the hourly rate for each attorney and paralegal involved in the case. The following chart lists the attorneys and paralegals who worked on the case, the hours each professional worked, and the hourly rate that Plaintiff claims for each professional:

| Professional | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| E. Lindsey Maxwell | Attorney | 536.45 | 400.00 | |
| Kathy Bailey | Attorney | 76.2 | 400.00 | |
| James Pitts | Attorney | 101.4 | 350.00 | |
| Maria Baechli | Attorney | 60.6 | 250.00 | |
| Maria Fedor | Attorney | 5.4 | 250.00 | |
| Michelle Bergman | Attorney | 92.6 | 250.00 | |
| Rachel Goldberg | Attorney | 47.9 | 250.00 | |

| Amanda Ortiz | Paralegal | 151.4 | 100.00 | |
| Alejandro Zorilla | Paralegal | 8.65 | 100.00 | |

Section 3 of Appendix B of the Local Rules for the District of Maryland establishes the

following guidelines for hourly rates:

- Lawyers admitted to the bar for less than five (5) years: $150-190.

- Lawyers admitted to the bar for five (5) to eight (8) years: $165-250.

- Lawyers admitted to the bar for nine (9) to fourteen (14) years: $225-300.

- Lawyers admitted to the bar for fifteen (15) years or more: $275-400.

- Paralegals and law clerks: $95-115.

Plaintiff asserts, and Defendant does not contest, that the aforementioned professionals have the

following levels of experience:

- Maxwell: 11 years

- Bailey: over 15 years

- Pitts: over 15 years

- Baechli: 9-14 years

- Fedor: 9-14 years

- Bergman: 9-14 years

- Goldberg: 9-14 years

- Ornitz: paralegal

- Zorilla: paralegal[2]

---

[2] Attorneys Baechli, Fedor, Bergman, and Goldberg are no longer associated with Plaintiff's attorneys' firm, Bailey Law Group. Plaintiff asserts that these attorneys had the stated level of experience when they worked on the case. Defendant has not argued or shown otherwise. Unless otherwise noted, the Court refers to these attorneys as "the attorneys no longer associated with the firm."

As the preceding chart shows, Plaintiff seeks to go outside the guidelines for only Maxwell ($400), who served as lead counsel and conducted the trial. The hourly rates that Plaintiff requests for Bailey and Pitts ($400 and $350, respectively) are at the higher end of the guidelines for their experience level. The hourly rates requested for the attorneys no longer associated with the firm ($250) and the paralegals ($100) fall within the guidelines, which are presumptively correct. *See Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 509 (D. Md. 2000) (stating that the guidelines "provide a presumptively reasonable range of hourly rates in . . . discrimination cases"). Furthermore, the evidence indicates that the attorneys no longer associated with the firm and the paralegals worked on the case meaningfully and Defendant has set forth no valid reason to reduce the hourly rates for these other professionals.[3] Therefore, the Court awards the following hourly rates for the attorneys no longer associated with the firm and the paralegals:

- Attorneys no longer associated with the firm: $250

- Paralegals: $100

The next issue is whether the hourly rates for Maxwell, Bailey, and Pitts are reasonable. Plaintiff argues that Maxwell deserves an upward adjustment from the guidelines because of the extraordinary work that he has performed on the case, the excellence of the results, and the fact that he usually charges $450 an hour for cases of this sort. However, the case was neither factually nor legally complex and Maxwell's skill and efforts, while good, did not go beyond what one would expect for this type of case. Furthermore, the County asserts, and Maxwell has not contested, that he is primarily a transactional attorney who does not specialize in employment litigation. In sum, based on Maxwell's role as lead counsel, experience, and the

---

[3] Defendant argues that paralegal fees are not compensable "costs." This argument misses the mark because "paralegal . . . time [is] to be included in attorney's fees." *Herold v. Hajoca Corp.*, 864 F.2d 317, 322 (4th Cir. 1988) (citations omitted).

length, complexity, and results of the case, the Court finds that $300 an hour is a reasonable rate. Furthermore, although Bailey is more experienced than Maxwell and appears to have a stronger background in employment law, Maxwell did significantly more work on the case than she did. Thus, absent extraordinary circumstances, it would be aberrational for Bailey to earn a substantially higher hourly rate than Maxwell. Therefore, based on all relevant considerations, the Court finds that $285 is a reasonable rate for Bailey. For similar reasons, the Court finds that $275 is a reasonable hourly rate for Pitts. Although Pitts is more experienced than Maxwell, he did not perform nearly as much work on the case. Moreover, Pitts's level of experience in employment litigation is unclear from the record. For these reasons, the Court awards the following hourly rates, which the chart below reflects:

| Professional | Position | Hours | Rate | Amount |
|---|---|---|---|---|
| E. Lindsey Maxwell | Attorney | 536.45 | 300.00 | $160,935 |
| Kathy Bailey | Attorney | 76.2 | 285.00 | $21,717 |
| James Pitts | Attorney | 101.4 | 275.00 | $27,885 |
| Maria Baechli | Attorney | 60.6 | 250.00 | $15,150 |
| Maria Fedor | Attorney | 5.4 | 250.00 | $1,350 |
| Michelle Bergman | Attorney | 92.6 | 250.00 | $23,150 |
| Rachel Goldberg | Attorney | 47.9 | 250.00 | $11,975 |
| Amanda Ortiz | Paralegal | 151.4 | 100.00 | $15,140 |
| Alejandro Zorilla | Paralegal | 8.65 | 100.00 | $865 |

Totaling the amount for each professional, the lodestar is $278,167.

The next question whether this amount should be adjusted in light of the *Johnson* factors. The Court finds that it should. Although Plaintiff prevailed on her retaliation claim and received the statutory maximum in compensatory damages, Plaintiff prevailed on only one of the four claims that she asserted. *See Westmoreland*, 876 F. Supp. 2d at 601(noting that Plaintiff asserted four essential claims even though, at one point, she pleaded them as eight separate counts). Furthermore, the Court declined to award front pay or backpay. Additionally, although Plaintiff received $300,000 in compensatory damages for emotional distress, this represents a fraction of the $2,000,000 in damages she sought. *See* Doc. No. 121 at 111; *see also Doe v. Chao*, 435 F.3d 492, 505 (4th Cir. 2006) (alteration in original) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)) ("Where recovery of private damages is the purpose of . . . litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought."). Moreover, despite the three-year duration of the case, it did not present any extraordinary factual circumstances or novel questions of law. Under these circumstances, even though Plaintiff received good results, an award of attorney fees in the $300,000 range would be grossly disproportionate to Plaintiff's overall success.

A more mechanical application of the *Johnson* factors also supports a reduction in attorney fees. As for factors (1) and (2), although Plaintiff's counsel expended considerable time on the case, the overall time was at the outer limit of what is reasonable given the factual and legal questions the case presented. Regarding factors (3) and (4), it is unclear from the record that Plaintiff's attorneys missed out on opportunities due to working on her case, and the skill required to prevail on this case was not exceptional. Factor (5) does not strongly favor Plaintiff

because, as the Local Rules indicate, attorney fees of $350 – $450 an hour are on the high end of what is customary for garden-variety Title VII litigation. For their part, factors (6) and (7) do not meaningfully apply to this case. Under factor (8), although Plaintiff received good results, the amount she was awarded is substantially lower than the damages than she sought. Similar to factor (5), factor (9) does not strongly favor Plaintiff because, although Maxwell asserts that he charges $450 an hour for cases of this sort, there is no evidence showing that he regularly handles Title VII cases. Factors (10) and (11) do not meaningfully apply to this case, other than the idea that Plaintiff had a hard time getting other attorneys to take this case. However, it is not clear how many other attorneys would not take the case or why they would not do so. Concerning the twelfth and final factor, $275,000, while heard of, is at the higher end of attorney fee awards in similar cases. Therefore, although Plaintiff's attorneys deserve to be compensated for the hard work they performed and the good results they obtained, the *Johnson* factors counsel in favor of a reduction of the lodestar.

Based on the preceding considerations, the Court finds that one should reduce the lodestar of $278,167 by 33%. This leaves an adjusted award of $186,371.89.

Defendant argues that the award of attorney fees should be $153,135. Defendant makes a series of arguments to support this assertion. Defendant asserts that Plaintiff's attorneys did not identify which hours where attributable to which of her claims. However, as noted, when all the claims involve a common core of facts, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Brodziak*, 145 F.3d at 197 (alteration in original) (citation and internal quotation marks omitted); *see also Fair Housing Council of Greater Wash. v. Landow*, 999 F.2d 92, 97–98 (4th Cir. 1993) (stating that "some claims may have such a common core of facts and legal theories

so as to prevent any allocation of the fees to the applicant's separate claims"). Defendant also seems to argue that Plaintiff's attorneys billed for the same tasks. *See* Doc. No. 112 at 10. This argument, however, is not fully clear and Defendant has not adequately identified specific billing entries reflecting such double-billing. To the extent Defendant takes umbrage with the fact that more than one attorney worked on the case, this argument would obviously lack merit. Multiple attorneys routinely work on the same case. Similarly, Defendant does not think that Bailey should be able to bill for the hours she spent at trial because Maxwell did the lion's share of the work at trial. Bailey did participate in the case to argue certain issues before the Court, however, and the case was sufficiently complex to warrant her sitting second chair. Finally, Defendant asserts that Maxwell should not be able to bill for five days of trial time because he called only two witnesses. But the Court knows of no authority proposing that the plaintiff's counsel should not be able to bill for the work that he performs during the defendant's case. Any other arguments that one can glean from Defendant's papers are picayune and warrant no express consideration. It also bears emphasis that the adjusted lodestar is only about $30,000 over the amount of attorney fees that Defendant suggested. Accordingly, the Court declines to further reduce the adjusted attorney fee award of $186,371.89.[4]

**E.    Costs**

In pertinent part, 28 U.S.C. § 1920 provides as follows:

---

[4] Defendant argues that Plaintiff's Supplemental and Second Motion for Attorney Fees are untimely because Plaintiff filed them more than fourteen days after the entry of judgment. *See* Fed. R. Civ. P. 54(d)(2)(B)(i). However, Plaintiff filed the Motion for Attorney Fees three days after the entry of judgment, and the Supplemental Motion and Second Motion are supplemental in nature. Indeed, one could argue that Plaintiff would not have had to file her Supplemental and Second Motions had Defendant not filed its JNOV Motions. Therefore, the Court treats the Supplemental and Second Motions as filed as of the date of the initial Motion. Defendant's argument also fails because, taken to its logical extreme, it would prevent victorious parties in Title VII litigation from obtaining attorney fees for any post-judgment litigation occurring more than fourteen days after the entry of judgment. It would be anomalous if plaintiffs could receive attorney fees for the efforts necessary to obtain a judgment before a district court but not for the efforts necessary to preserve the judgment before the same court.

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; . . . .

28 U.S.C. § 1920.

For its part, Rule 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "[T]he rule creates the presumption that costs are to be awarded to the prevailing party." *Cherry v. Champion Int'l Corp.*, 186 F. 3d 442, 446 (4th Cir. 1999). "To overcome the presumption, a district court must justify its decision [to deny costs] by articulating some good reason for doing so." *Id.* (alteration in original) (citation and internal quotation marks omitted). A district court's decision declining to award costs is reviewed for an abuse of discretion. *Id.* (citation omitted).

Under Local Rule 109.1(b), "the [request for] costs shall be supported by affidavit and accompanied by a memorandum setting forth the grounds and authorities supporting the request[,] [and any] vouchers or bills supporting the cost being requested shall be attached as exhibits." Pursuantly, the Clerk of the Court for the District of Maryland has declined to award costs where the party seeking costs failed to file a memorandum in support of its request and largely failed to submit supporting documentation. *See Bennett v. Kaiser Permanente*, 8:10-cv-02505-AW (D. Md. 2010), Doc. No. 51.

In this case, Plaintiff requests $5,743.53 for the following categories of costs: (1) service of process; (2) copying-related expenses; (3) deposition transcripts; (4) computerized legal research; (5) mailing; and (6) lunches during trial. Yet, while Plaintiff filed various motions for attorney fees and costs, Plaintiff's memoranda contained no argumentation regarding the propriety of costs. Nor did Plaintiff attach any vouchers, bills, or similar evidence substantiating her costs other than a computer printout. *See* Doc. No. 107-2 at 23–24. Therefore, the Court cannot adequately assess the propriety of Plaintiff's request. Accordingly, the Court denies Plaintiff's request for costs.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Second JNOV Motion and **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motions for Attorney Fees. A separate Order follows.


     December 16, 2013                                    /s/
          Date                                  Alexander Williams, Jr.
                                                United States District Judge